## Case No. 1,686.

### The BOTHNEA.

### The JANSTOFF.

[2 Gall. 78.] [1]

Circuit Court, D. Massachusetts. May Term, 1814.[2]

PRIZE—COLLUSIVE CAPTURE — PROOF REQUIRED—DUTY OF CAPTORS.

1. Case of collusive capture. Farther proof denied to the captors, and condemnation to the United States subject to the rights of the seizing officer.

[See The George, Case No. 5,327, affirmed 2 Wheat. (15 U. S.) 278.]

[See note at end of case.]

2. In what cases farther proof allowed or not.

[See The George, Case No. 5,327; The Betsey, Id. 1.364; The Short Staple v. U. S., 9 Cranch (13 U. S.) 55.]

3. It is the duty of captors to bring in the prize crew, or at least the master and principal officers, with the prize, for adjudication.

[See The George, Case No. 5,327; The Jane Campbell, Id. 7,205; The Arabella, Id. 501; The Flying Fish, Id. 4,892; The Julia, Id. 7,576; The Eleanor, 2 Wheat. (15 U. S.) 345; The Shark, Case No. 12,708.]

[Appeal from the district court of the United States for the district of Massachusetts.

[Proceedings to condemn the foreign vessels Bothnea and Janstoff as prizes. Decree of condemnation. See note at end of case.]

W. Prescott and Otis, for captors.

Blake and Dexter, for claimants.

STORY, Circuit Justice. These cases come before the court under very unusual and embarrassing circumstances. From the documents and testimony in the preparatory evidence it appears, that the Bothnea and the Janstoff are foreign vessels, having on board, as is confessed on all sides, false and simulated Swedish papers. They both sailed from Halifax, in Nova Scotia, about the 24th of November, 1813, laden with cargoes of English goods, destined for the United States; and, on the same day, were captured near the Ragged Islands, either really or collusively, by the privateer Washington, of 24 30-95 tons, one gun and fifteen men; belonging to Portland, and commanded by William Malcomb. They were captured in sight of each other, the Janstoff first, within about three hours, and the Bothnea within about nine hours, after leaving Halifax. At the time of the capture, there were on board of the brig seven persons and on board of the schooner five persons, composing their respective crews, and one American passenger in each vessel. The whole of the crews were taken from each vessel, and landed at the Ragged Islands; the American passengers were retained on board, and under the superintendence of prize masters and crews;

¹ [Reported by John Gallison, Esq.]
² [Reversed in 2 Wheat. (15 U. S.) 169.]

the Bothnea was conducted into Salem, and the Janstoff into Plymouth, in the district of Massachusetts. Immediately upon their arrival, they were seized by the collectors of those ports for an alleged fraudulent violation of the non-importation act. Proceedings were also had by the captors against both vessels, as prize of war, before the district court of Massachusetts. The passengers, viz. Isaac Miller and Nathaniel Whittemore, were examined on the standing interrogatories, and the ship's papers were deposited in court by the prize masters. The papers, found on board of the Bothnea, were certain Swedish simulated ship's papers, two bills of lading of the cargo, dated the 23d of November, 1813, purporting that the whole cargo was shipped by John Moody and Co. merchants at Halifax, for New London, consigned to order; a clearance from Halifax dated on the same day, a British license from Sir John Sherbrooke, dated at Halifax on the 9th of November, 1813, authorizing John Moody and others to export, in any vessel not belonging to France, to any port in the United States, any British goods on British or American account, which license was to continue in force for two months, and two letters dated at Halifax on the 23d of November, 1813, one purporting to be addressed to the consignee of the cargo, the other to be addressed to the captain of the Bothnea. These letters are as follows:

"Halifax, November 23d, 1813. Dear Sir: We now only inclose you bill of lading of the cargo shipped on our joint account per the Bothnea, agreeable to the memorandum left with us by Vanderbut, when last here. The invoices we forwarded in duplicate, one by P. Jones, and the other by Schonenburg, which you will have received before this. Z. has our particular instructions how to proceed, when in with the Squad. We have settled for A.'s share of the compensation. B. 2 will pay his. We have fixed on two hundred dollars, exclusive of the freight, which we have also arranged for. Most sincerely do we wish this speculation to succeed. At the same time, request your earliest advice how to proceed with the next. Do not trust too much paper. We have directed Z., in case of meeting with an American cruiser, to destroy all! We are, &c. J. Moody & Co."

"Halifax, November 23d, 1813. Capt. I. K.—Schooner Bothnea. Sir: We hand you herewith sundry enclosures respecting the cargo of the Bothnea, to your most particular care. You will perceive the necessity of using every possible caution. We are only apprehensive of shaving mills. You will of course secrete every thing respecting this transaction. In case of British interruption, we must recommend your being well assured, that there is no deception, as you must be aware of the facility, with which American cruisers may

pass for English. The invoices of these goods are already forwarded. You will make the best of your way to N. When in with any of the B. B. squadrons, come forward with your Ex. Li. which will safely pass you, and then nothing will remain, but activity and despatch in getting the goods on shore. We should not have embarked ourselves so largely in this concern, but from the ease with which dry goods can be smuggled into those places, if properly managed. The bill of lading is to order. You will, therefore, receive instructions from our friends A. 1 and B. 2. We expect your best plan will be to lay off under the protection of H. M. ships, and deliver the cargo in boats and lighters, without proceeding farther, and as our friends are already advised on the subject, no doubt every necessary step will be taken. Should, however, any unexpected casualty happen, we recommend your getting out of the way, as we would rather the whole should be sacrificed, than any mischief happen to ———; but above all things keep out of sight your Ex. Li. clearance, and this letter. Do not confide too much. If you have any suspicion, destroy all at once, and after committing this to memory, be sure to put it perfectly out of danger. As to the return cargo, we need not say any thing on the subject, having the fullest confidence, that a voyage to St. Bart's may be profitably effected with certain articles; flour out of the question, unless rye. B. No. 2 will pay you the compensation agreed, exclusive of the freight we have allowed. A.'s proportion we will settle with our own. If it is possible to obtain convoy, we will, but it is doubtful. We are, &c. Jno. Moody & Co. P. S. Do not write for fear of accidents. Let your communication be verbal."

The papers on board of the Janstoff were, certain Swedish simulated ship's papers, a British license and clearance of the same date and purport, as in the case of the Bothnea, two bills of lading of the cargo dated on the 23d of November, 1813, on the same account, destination and consignment, as in the case of the Bothnea, and two letters dated at Halifax on the same day, one addressed to Messrs. B. 2 and A. 1, New London; the other to the master of the Janstoff. The last of these letters is an exact copy of that addressed to the consignee of the Bothnea, except in the direction; the other is as follows:

"Halifax, Nova Scotia, November 23d, 1813. Capt. P. S. Z.—Brig Janstoff. Sir: We now wish you to proceed as immediately as possible with the cargo, agreeable to our verbal directions. We are fearful of entering too fully into particulars, but as this cargo is altogether B. manufactures, you will have more difficulty to contend with; however, we trust to good luck. Secrete, with every possible caution, certain documents, and do not be too easily satisfied by appearances. You know how easy an imposition

may take place; but as we calculate on convoy both for you and the Bothnea, we do not apprehend any danger, till you are well near your port. The risk is, that even your colors would not be sufficient in case of meeting an A—— cruiser. When you get in with the Bri. men of war, you may safely produce your Ex. and under their protection get all out in boats and lighters. You will bear in mind, that the concern is the same with the Bothnea. We have forwarded the particular invoices to our friend A. No. 1, who will pay you the compensation fixed both on our own account, and of the other parties. As the blockade of the Sound is likely to be rigorous, we leave it to your own calculations whether another trip to St. Bart's can be undertaken. The fact is, flour will not meet the demand calculated, as government stores are well supplied, nor do we think it can be procured with you, to answer the market, for some time. Be careful of committing any of the concern with us or yourself; we indeed think you had better give all up, and get away, rather than expose the business, should you be intercepted; and our greatest danger is from the small travellers in shore, therefore better keep close with John Bull. We are, &c. Jno. Moody & Co."

At the hearing, a claim was interposed by the district attorney, in behalf of the United States and of the collectors, praying a condemnation to them, upon the ground of a collusive capture, and fraud upon the non-importation act. An application was also made by the captors for an order for further proof, to prove that the vessels and cargoes were in fact the sole property of British subjects, which was rejected; and on the first day of February, 1814, the district court dismissed the libel of the captors, and condemned both vessels and their cargoes to the United States. From this decree an appeal has been interposed to this court, and here the application has been renewed for further proof. The propriety or impropriety of allowing such an order depending upon the nature of the case disclosed upon the original evidence, I directed the cause to be argued, and it has accordingly been argued upon that evidence, and it now remains for me to pronounce a decision.

Before I enter on the discussion of the merits of the particular cases, now before the court, I will advert to some considerations touching the nature of further proof. And I conceive, that in no case whatever is the court absolutely concluded by the original evidence. It is at liberty to entertain doubts extrinsic of such evidence, and to be satisfied of the verity of the transaction by proofs drawn beyond the mere formal papers and attestations of the parties. It will not however exercise its discretion in cases liable to no just suspicion; but will content itself with an adherence to its ordinary course, unless there arise some doubt upon the original papers, or some stringent evidence from an extrinsic source. The Sarah, 3 C. Rob. Adm. 330; The Romeo, 6 C. Rob. Adm. 351. In cases of reasonable doubt it will admit the claimant to further proof, where his conduct appears fair, and is not tainted with illegality. It is more sparing in its indulgence to the captors from an anxious solicitude to avoid complex proceedings and collateral inquiries. It therefore rarely allows it to the captors, where the transaction appears unsuspicious upon the preparatory evidence. The Sarah, 3 C. Rob. Adm. 330; The Haabet, 6 C. Rob. Adm. 54. It will however yield to such an application, where strong circumstances or obvious equity require it. But in all such cases, it is admissible only under the special direction of the court. The Jonge Jacobus, Baumann, 1 C. Rob. Adm. 243; The Adriana, Id. 314; The Maria, Id. 340. And such direction can never be obtained, where there has been gross misconduct or fraud, or the case does not admit of a fair explanation, on behalf of the captors. The French law as to prize differs in this respect; for the evidence of the captors is not only admissible, but constitutes an essential ingredient upon the original hearing. Valin, Des Prises, c. 13, p. 193; 2 Valin, Comm. 324, Ordin. Louis 14, lib. 3, tit. 9, art. 24.

Upon examining the facts of the cases before the court, it seems difficult, upon the first blush, not to entertain some doubts, whether the coloring is not artificial. Perhaps, when once awakened, the mind becomes too ready to indulge in vague and indistinct suspicions. The very simplicity of a transaction, and the face of honesty, which it wears, may, under such circumstances, attract a weight of jealousy, more formidable than the most complicated tissue ever woven by the ingenuity of fraud. Every appeal to the understanding then comes attended with the grave warning, nimium ne crede colori. It becomes necessary, therefore, to sift the various circumstances of suspicion combined in these cases, and to ascertain their value. I do not say, that each is to be separately weighed, as if it stood alone. The absolute force of a single fact may not be great, but combined with a mass of strange occurrences, it may acquire an adscititious, and perhaps decisive preponderance. One of the most striking characteristics of the present cases is the extraordinary nature of the equipment and voyage. Here were two vessels, under spurious neutral flags, loaded with extremely valuable cargoes of British merchandise on British or American account, destined for the United States, and beyond all question upon an illegal traffic. The crews of the vessels consisted apparently of foreigners; but the fraudulent simulation of the neutral papers was so obvious, that it could not deceive the most negligent cruiser. The British license and clearance, and the docu-

ments, which respected the cargo, if produced, would afford such incontrovertible evidence of illicit trade and British interests as would ensure condemnation of both vessels and cargoes. The same result would unavoidably flow from a suppression of those papers. The case would, therefore, under every aspect, be pregnant with insurmountable difficulties. Under such circumstances, if the voyage were really intended for New London, it would be natural to suppose, that the vessels would be equipped with arms, at least to defend themselves against small American cruisers. The neutral disguise was so thin, that a want of armament would hardly be apologized for by the innocuous garb of neutrality. Yet there is not the slightest pretence of any armament. It may be said, that the letters found on board point to the existence of convoy for the voyage, and thereby rendered any armament unnecessary. If a British convoy were really expected, how happened it, that no such convoy was found, although the vessel sailed on the very next day after these letters were written? If by convoy was meant the convoy of the Washington privateer, it would afford a more ready solution of the difficulty.

In the next place, on a real destination to New London in a smuggling trade, how happened it that one American passenger was put on board of each vessel, and each of them engaged and employed by Messrs. Moody and Co. with such notoriety, that each knew the whole object of the voyage? It is asserted, and very gravely, by the passengers, that they are utter strangers to the whole adventure, and that they have no interest therein. If this be true, I should be glad to know, what recommended them to Messrs. Moody and Co. for such a service. As Americans of honor and integrity they would feel an interest to disclose on their arrival so gross a fraud on our laws. If they were not therefore actors in the drama, they might be unfortunate marplots. It is utterly incredible, that mere strangers should be trusted with such important secrets. They must have had some character, which has not been avowed, and that character could have been little short of the confidential agency of the parties. I confess, that I should have been glad to have learned a little more of the history of these gentlemen, upon what occasions and in what manner they found their way to Halifax. There is a perfect silence in their answers on this head; and one of them only states, as if by accident, that he had a parole, as a prisoner of war. If the captures were collusive, I can readily conceive a good reason for these gentlemen being on board, even without the character of confidential agency; if the captures were bona fide, I am yet to learn, how this circumstance can be reasonably explained.

In the next place, the circumstances of the capture are somewhat extraordinary. The vessels had hardly been out of port three hours, before, in the very mouth of British territory, they were met by the privateer, and both captured without the slightest resistance or attempt to escape. It is said, that the privateer was mistaken for a British cruiser. Now, though in the Bothnea (which was last captured) the passenger answers, that the master showed to the captain of the privateer the ship's papers, "believing him to be a British cruiser," there is no evidence in the Janstoff to show a similar mistake. The omission may not be material; and in all probability the privateer did board under British colors. Now, admitting this fact, why were not the papers concealed from the cruiser? It is said, that supposing her to be British, there was no danger in the disclosure. But let us look at the letters on board. In the letter to the master of the Janstoff he is expressly warned to "secrete with every possible caution certain documents, and not to be too easily satisfied by appearances."—"You know how easy an imposition may take place."—"Our greatest danger is from the small travellers in shore, therefore better keep close with John Bull."—To the master of the Bothnea the language is equally explicit.—"We are only apprehensive of shaving mills; you will of course secrete everything respecting this transaction. In case of British interruption, we must recommend your being well assured, that there is no deception, as you must be aware of the facility with which American cruisers may pass for English." "Do not confide too much. If you have any suspicion, destroy all at once, and be sure to put it perfectly out of danger."—Nothing can be more strong, than this language, as to the conduct to be observed in case of being searched by any armed ship. Yet not a single paper was suppressed or destroyed. All was produced, and upon the mere pretence, that the privateer assumed herself to be British. The place of capture too was immediately within reach of British ports. Under such circumstances, would not a master, entrusted with so valuable a cargo, with such pointed instructions, have used more caution? Would he not have insisted on being carried into Halifax for adjudication, or on having a British commission and documents shown him, or in some other way have tested the sincerity of the character of the captors, before he would have put the whole property into such imminent hazard? In fact, if the capture were collusive, every thing should have happened just as it did. If it were bona fide, there seems to have been unusual negligence or stupidity on the part of the captured. It is strange, too, that the Bothnea took no alarm. She saw the capture of the Janstoff, and must have deemed it at least a questionable case; still, however, she kept on her regular course undisturbed by the dangers, which were thick-

ening about her, and blind to the sinister omens.

Another extraordinary circumstance attending the captures was, that the whole crews were taken out and landed at the Ragged Islands, and the American passengers kept on board, as the solitary witnesses to the transactions. It will be recollected, that this was nearly eighteen months after the declaration of war, and when there was scarcely a pretence for ignorance of the manner, in which prizes were to be conducted into port. The privateer's crew consisted also (as both parties agree) almost altogether of masters and mates of vessels, who were also the owners of the privateer. There was also a bounty paid by the government for prisoners of war. Under such circumstances therefore there was scarcely an apology for omitting to bring in the captured crews. Yet a greater irregularity than the omission so to do could hardly have occurred. It is the duty of the captors to bring in the prize crew, or at least the master and principal officers, with the prize, for adjudication. This duty is not only enjoined by the prize act, but is enforced by the express instructions of the president, which are delivered to every cruiser with her commission. It is also invariably required by the practice of the admiralty, and its omission is reprehended in the strongest terms by prize courts. The Speculation, C. 2 Rob. Adm. 293. Indeed, unless it be explained, it is considered as almost amounting of itself to evidence of management or tampering or fraud; and the courts have invariably withheld a sentence of condemnation, even in the clearest cases, where this omission has appeared, until a satisfactory explanation has been given. 5 C. Rob. Adm. 385, footnote a. I do not say, that it is such an irregularity, as amounts to a forfeiture of the right of prize; but I adopt the principle of the learned counsel for the claimants, that if the captors have not been prevented by necessity, accident, or excusable error, from producing the captured crew for examination, they are not entitled to any indulgence from the court; and the court will not let them into the benefit of further proof. It will not aid them any more than it is compelled to do; but leave them to reap the fruits of their own misconduct, however bitter or unpalatable they may be.

Upon what pretences then is this irregularity attempted to be justified? It is not asserted, that the captors were in ignorance that any person belonging to the crew was to be brought in. Their conduct as to the American passengers evinces the contrary. Yet why should the passengers have been chosen for this purpose?—If asked, they might have declared their ignorance of the whole transactions, which would not have made them the best of witnesses. It is said, that the whole crews were removed, and the same number of Americans put on board in their stead, with a view to elude capture by the British cruisers, if overhauled, by passing for the original Swedish crew. Now I cannot but think this excuse to be extremely unsatisfactory. How would it have been possible for Americans to pass for Swedes, or other foreigners? Our very accent and dialect would betray us to the most raw and inexperienced of British commanders. If the passengers on board were really confidential agents, (and I beg to know, how the captors had any proof of the negative), would they not have had strong inducements to disclose the facts to a British cruiser?—And if they were mere strangers, what right had the captors to expect an active co-operation in their own particular schemes? It is said also, that it became necessary to remove the crews on account of their number, which nearly equalled that of the privateer. This might account for the removal of some part of the crews, but it is hardly sufficient to meet the difficulty of the removal of the whole. The masters at least might have been retained. A course quite as natural would have been, to put a part in confinement in the privateer, and in company with the prizes to seek the first American port for safety. The landing too of the crews at the Ragged Islands seems a measure peculiarly well calculated to give notice to the enemy of the capture, and to enable him, with ordinary diligence, to attempt a recapture. If all these occurrences took place in perfect good faith from the ignorance or the lenity of the captors, it is extremely unfortunate, for they are precisely such as we should expect in a case of collusive capture.

There are other circumstances in the case, respecting which the ingenuity and eloquence of counsel have been employed to attach, or repel, the imputation of fraud. I forbear to touch them. Some of them are of light and trivial import, and some of a graver cast. But independent of the singularities, which I have before enumerated, I do not think that they can be entitled to much consideration. On the whole, do these cases, taken in connection, for it is quite impossible to separate them, present, under all the circumstances, a fair and natural transaction, or an artificial and well adjusted fraud? If the circumstances are such, as are consistent with good faith, and admit of a reasonable explanation, then further proof may be indulged to the captors. If they appear incapable of such explanation, it ought peremptorily to be denied. It is remarkable, that upon the supposition of a collusive capture by an agreement between British and American subjects engaged in an illegal traffic, the whole conduct of the parties, and the appearances of the documents on board, are consistent. No incongruity has been shown in argument, and, upon further examination, I have not been able to discern any. On the other hand, the conduct of the parties and some expressions in the letters, admit of a more ready solution upon

the same supposition, than if the capture were to be deemed bona fide. These expressions may be considered as containing the real wishes and instructions of the parties concerned, mingled with such disguises, as might cover the fraud from a careless observer. What is said of convoy, of the extreme anxiety of the parties to be kept from exposure in case the enterprise should be intercepted, and of their solicitude to avoid American cruisers, may be deemed of this description. I do not say, that they exclusively point to such an interpretation, but they readily admit it. There is also one expression in each of the letters addressed to the consignees, which I cannot but think, has a meaning, which the passengers perhaps could have explained. It is this, "we have directed Z. in case of meeting with an American cruiser, to destroy all." Who is the person thus designated by the letter Z? It cannot be the master of the Janstoff, who is called Zuilltram, because the same expression occurs in the letter on board of the Bothnea, whose master is called Koan. It is inconceivable, that the authority to destroy should not have been given separately to some person on board of each vessel, as they might separately have encountered an American cruiser. I cannot therefore but believe, that Z. was the mystic name of the confidential agent of the parties on board of each vessel, though I pretend not to point a finger at the personage.

It is possible, that 1 have attached more weight to the extraordinary circumstances of these cases, than they deserve. Knowing the strong temptations to illicit intercourse in consequence of the high price of British manufactures, I may have indulged in too rank suspicions. I have the consolation however to know, that if in this I commit an error, it can, and it will, be corrected by the wisdom of a superior tribunal. My own judgment however must be my guide, and I am free to declare, that I consider the appearances of collusion to be so marked on this transaction, and so entirely incapable of a fair explanation, that I must reject the application for further proof, and dismiss the libel, so far as it respects the captors. If I had even deemed further proof admissible on the part of the captors, that proof could not have extended beyond the explanation of the facts of the capture. To allow it further, would be to substitute, instead of the regular evidence required by the law, evidence which might be procured after time given to tamper with witnesses, and to enable the parties to mould a history suited to the pressure of the occasion. Such an application I should hardly deem allowable under any circumstances. I do not think it necessary, as these causes must go to the supreme court, to take time to consider, to whom the property ought to be adjudged, whether to the United States alone, or to the United States, subject to the rights of the seizing officers. As at present advised, I am very clear, that it ought to be condemned jure belli, as enemies' property; and I shall accordingly condemn it to the United States, subject to the right of the collectors to share in the proceeds, as seizing officers. Upon the appeal, the question, in case of a condemnation to the United States, must necessarily come in review before that court. I wish it to be understood, lest by any mistake the papers should find a place in the record, that I expressly reject the additional affidavits of the prize masters, which were objected to at the hearing in the district court and in this court. They are admissible only under an order of further proof, which was refused in both courts.

NOTE [from original report]. On appeal to the supreme court, after argument, further proof was directed; and at February term, 1817, upon the hearing of the further proof, the decree below was reversed, and condemnation passed to the captors. 2 Wheat. [15 U. S.] 169.

[NOTE. The reversal by the supreme court was for the reason, as assigned by Johnson, associate justice, that the evidence was insufficient to fasten on the captors a participation in the fraud, and that "the whole may have been, for aught we know, a combination of machinery,—the result of the most consummate art. It is certainly true that, in one view of the case, everything may be attributed to artifice; in another, to natural conduct. Scarcely a feature of it may not be indifferently pronounced the lineament of guilt or innocence. In such a case a court of justice has no alternative. It must pronounce in favor of innocence." The Bothnea and The Jahnstoff, 2 Wheat. (15 U. S.) 169.]